UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CCR INTERNATIONAL, INC., CCR DEVELOPMENT GROUP, INC., JOSÉ FUERTES, and BANCO COOPERATIVO DE PUERTO RICO,

Plaintiffs and Counterclaim Defendants,

-v-

ELIAS GROUP, LLC,

Defendant and Counterclaim Plaintiff.

15 Civ. 6563 (PAE)
16 Civ. 6280 (PAE)
17 Civ. 6697 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case arises from a series of transactions concerning a Puerto Rican soda brand, Coco Rico. Before 2008, Coco Rico was owned by CCR International, Inc. ("CCR") and José Fuertes ("Fuertes"), whose family had long operated the company. In 2008, CCR sold the Coco Rico assets to CCR Development Group, Inc. ("CCRDG"), which promised to pay for those assets over time. But when CCRDG defaulted on its payments, CCR turned to the owner of Elias Group, LLC ("Elias"), who had long distributed Coco Rico soda, for help. In 2013, CCR assigned the debt owed to it by CCRDG to Elias. In exchange, Elias paid CCR some cash and agreed to make efforts to buy the Coco Rico assets from CCRDG. In 2015, Elias did so.

The pending summary judgment motions concern whether Elias has met its contractual obligations to CCR, CCRDG, and Fuertes (the "CCR Parties"). Elias contends that it has. The CCR Parties argue that Elias owes CCR another $8.5 million and Fuertes an annual salary of $180,000. Both sides seek summary judgment on the claims relating to Elias's obligations to CCR. Only Elias seeks summary judgment as to Fuertes's claims against it.

For the following reasons, the Court grants Elias's motion in full and denies the CCR Parties' motion in full.

# I. Background

## A. Factual Background[1]

### 1. Parties

CCR is a Puerto Rico corporation operated by its two sole shareholders, José Fuertes ("Fuertes") and his brother Roberto Fuertes ("Roberto Fuertes"). Dkt. 201 ("CAC") ¶ 1; JSF ¶ 1; Dkt. 242-3 ("Fuertes Tr.") at 118. Until 2008, CCR owned the Coco Rico soda brand and all its assets (the "Coco Rico assets"). JSF ¶ 2. CCR's main business was manufacturing and selling the concentrate used to make Coco Rico soda. Fuertes Tr. at 118.

CCRDG is also a Puerto Rico corporation. CAC ¶ 2. Its sole shareholder is Francisco Jose Rivera Fernandez ("Rivera"). JSF ¶ 6. In 2008, it bought all right, title, and interest in the Coco Rico assets, including all trademark rights. *Id.* ¶ 11.

Until 2015, Fuertes maintained homes in both New York and Puerto Rico. *Id.* ¶ 5. As of August 8, 2016, he moved from New York to Florida, while maintaining a separate residence in Puerto Rico. *Id.* ¶¶ 4–5.

Elias is a Delaware limited liability company ("LLC") with a principal place of business in New York. CAC ¶ 5; Dkt. 189 at 1. Richard Hahn, a citizen of California, is Elias's sole member. CAC ¶ 5; Dkt. 189 at 1.

---

[1] The Court draws its account of the facts from the parties' respective submissions on their motions for summary judgment, including the parties' joint statement of undisputed facts, Dkt. 242-1 ("JSF"); the exhibits attached to Elias's motion for summary judgment, *see* Dkts. 242-1–28; and the exhibits attached to the CCR Parties' memorandum of law in support of their motion for summary judgment and opposition to Elias's motion, Dkts. 248-2–12. Unless otherwise noted, docket references relate to Case No. 15 Civ. 6563.

Banco Cooperativo de Puerto Rico ("BanCoop") is a Puerto Rico corporation with its principal place of business in Puerto Rico. CAC ¶ 4; Dkt. 189 at 1.[2]

**2. General Background**

CCR is a family business, which had been owned and operated by Fuertes's father before he and his brother took over. *See* Fuertes Tr. at 86, 226. Since at least 1999, the Fuertes family had entertained and negotiated offers to sell the company. *Id.* at 24–25. One of those negotiations included a nearly completed sale to a company called B. Fernandez, which had offered about $6 million. *Id.* at 135. Another involved a potential sale to Coca Cola's Puerto Rican franchisee. *Id.* at 133–34. Last, Harold Honickman, the father-in-law of Elias's sole member, Richard Hahn, had at one point offered Fuertes $5 million. *Id.* at 134–36, 214; *see also id.* at 51, 144–45 (Honickman and Hahn had "always been interested in the brand"). The Fuertes family, however, did not accept any of these offers and, instead, remained the owners of the CCR brand and assets until 2008. *Id.* at 135–36.

**3. Relevant Agreements**

The parties' claims revolve around several agreements relating to ownership over, management of, and work related to the Coco Rico assets. The Court reviews the terms of each in turn.

*a. 2008 Asset Purchase Agreement Between CCR and CCRDG*

On March 31, 2008, CCR sold "100% of the CCR INTERNATIONAL, INC assets, including but not limited to, those assets used to manufacture the Coco Rico Beverage and the Coco Rico Trademark along with the registered Product Base Formula," to CCRDG. 2008 APA at 2; JSF ¶ 11. To effect that deal, CCR and CCRDG, which had recently been formed for the

[2] After joining this action, BanCoop settled its claims with the other parties and was terminated from the cases. *See* 17 Civ. 6697, Dkt. 120.

purpose of buying those assets, entered into an asset purchase agreement. *See* 2008 APA; Dkt. 242-6 ("Rivera Tr.") at 13. Rivera is CCRDG's sole owner and operator. *See* Rivera Tr. at 13. Rivera and Fuertes also run a consulting and investment firm together and have engaged in various business transactions together. *See id.* at 173–74; Fuertes Tr. at 16–18.

Under the 2008 APA, CCRDG agreed to pay "approximately, but not more than" $12.8 million, including a $100,000 up-front "cash deposit"; $11.2 million payable in six years' worth of $50,000 monthly "apportionments," with the balance due at the end of the sixth year; and $1.5 million to be placed in an escrow account at the time of closing. *Id.* § 2. CCRDG appears to have restructured most of its obligations under the 2008 APA by issuing a $9 million note to CCR, although the terms of that note do not appear to have been produced or explored in this litigation. *See* Fuertes Tr. at 39 ("Q. So CCRDG, let me say it different and tell me if I am right. CCRDG purchased the Coco Rico assets as they are defined in the agreements from CCR for 12.8 million dollars? A. Yes. Q. And as part of that purchase CCR took a note from CCRDG in the amount of $9,000,000? A. Yes."); Rivera Tr. at 20–21. As discussed more fully below, CCRDG defaulted on most of its payment obligations under the 2008 APA and the $9 million note, leaving the bulk of the latter unpaid after several years. As a result, CCR began looking for other ways to resolve that uncollectable debt.

*b. 2009 Independent Contractor Agreement*

On August 26, 2009, CCRDG and Fuertes executed an agreement in which CCRDG retained Fuertes to "dedicate his entire working time, attention and energies to the business of" CCRDG. JSF ¶ 17; Dkt. 242-14 ("2009 ICA") § 1. In exchange, CCRDG agreed to pay Fuertes $18,000 per month and up to 10% of the company's profits, as well as a percentage of the selling price should CCRDG ever sell the Coco Rico trademarks to a third party. *Id.* § 3.

*c. 2013 Assignment Agreement Between CCR and Elias*

After CCRDG and CCR executed the 2008 APA, CCRDG defaulted on its payments thereunder. *See* JSF ¶ 19; Fuertes Tr. at 205 (CCRDG paid about $3.6 million total); Rivera Tr. at 67 (CCRDG only paid between $3 and $4 million under the 2008 APA); Dkt. 242-9 ("First Hahn Tr.") at 138–39.[3] In response, CCR "explored many alternatives," including suing CCRDG directly. Fuertes Tr. at 51, 86. Ultimately, because of CCR's own lack of cash, CCR instead "went for help" to Richard Hahn. *Id.* at 86; *see id.* at 51 ("We didn't have any cash."). Hahn is the owner and president of Good-O Beverages ("Good-O"), a longtime and major distributor of Coco Rico soda for CCR (and then CCRDG). First Hahn Tr. at 14, 30; Rivera Tr. at 88. He is also the son-in-law of Harold Honickman, who had once offered to buy CCR for roughly $5 million. Fuertes Tr. at 134–36, 214.

On January 30, 2013, CCR assigned to Elias—of which Hahn is the sole member—all of CCR's rights to receive payment from CCRDG under the 2008 APA. *See* JSF ¶¶ 23–24; Dkt. 242-15 ("Assignment Agreement"). CCR's obligations to Elias under the Assignment Agreement are straightforward. CCR agreed to assign to Elias "[a]ll rights of [CCR] to receive payments under the [2008 APA], including, without limitation, the Escrow Amount," as well as all of CCR's rights "to receive stock in CCRDG" and "any . . . other rights arising by reason of, or in connection with," the 2008 APA. Assignment Agreement § 1.01(a)–(d). In other words, Elias obtained from CCR the right to receive any payments then owed by CCRDG to CCR under the 2008 APA, which the Assignment Agreement represented to be "at least $9,000,000." *See id.* at 1.

[3] CCRDG had also pledged the Coco Rico assets as collateral for a separate bank loan, on which it had defaulted. *See* First Hahn Tr. at 138–39. "So the bank was in the position where it could foreclose on those assets." *Id.*

Elias's payment for those rights had more complicated terms.  Those complications, and the extent of Elias's performance, form much of the basis of the present controversy.

First, Elias had to make an "initial payment" of $300,000, to be paid in three unequal installments upon the occurrence of three separate events.  *See id.* § 1.03(a)(i) (requiring payment of $80,000 upon CCR's delivery to Elias of its certificate of incorporation and other corporate materials); *id.* § 1.03(a)(ii) (requiring another $70,000 payment if, after paying the above $80,000, CCR delivered additional documents to Elias, including a certificate of good standing); *id.* § 1.03(a)(iii) (requiring final $150,000 payment at the end of Elias's due diligence).  Elias appears only to have paid the first $70,000 and $80,000 payments, for a total of $150,000.  *See* JSF ¶ 46; Fuertes Tr. at 53–54.

Second, Elias agreed to pay CCR monthly amounts it received from CCRDG pursuant to its assigned rights under the 2008 APA.  *See* Assignment Agreement § 1.03(b).  Elias's obligation to pay those amounts, however, was "conditional upon [Elias] having received such sums from CCRDG," and CCRDG appears seldom to have paid Elias those apportionments.  *Id.*; *see* Fuertes Tr. at 55–56 (estimating such payments over the course of the Assignment Agreement, to be less than $500,000, most of which CCRDG paid directly to CCR).

Elias's third and last payment obligation centered on its efforts to buy the Coco Rico assets from CCRDG.  If Elias "acquire[d] all right, title and interest in and to all of the Coco Rico Assets," then the above monthly obligations would terminate "and be replaced with [Elias's] obligation to make either (in [Elias's] discretion) of the following payments to [CCR]": (1) a "Yearly Payment" of $450,000 per year until Elias pays a "Buyout Amount"; or (2) the "Buyout Payment," less the amount of the initial payment.  Assignment Agreement § 1.03(c)(ii)(1), (2).  The agreement then defined "Buyout Amount" as follows:

The term "Buyout Amount" means $5,000,000 reduced by the following amounts:

> (1) The amounts, if any, previously paid to [CCR] pursuant to Section 1.03(c)(i); and
>
> (2) If the aggregate consideration given by [Elias] for its acquisition of the Coco Rico Assets includes the payment of any amount or other valuable consideration in addition to the release of CCRDG's payment obligations under the [2008 APA], then by the amount of such additional payment or the value of such additional consideration (such value, as reasonably determined by [Elias]); and
>
> (3) If the Coco Acquisition occurs other than pursuant to an amicable transaction between [Elias] and CCRDG, including, without limitation, any litigation, foreclosure, bankruptcy purchase, other proceeding or otherwise, then by the aggregate amount of any and all costs of [Elias] incurred in connection with such acquisition . . . .

*Id.* § 1.03(c)(iii). The first and third terms are not relevant here. But the second is key: Elias's "buyout" obligation to CCR was $5 million, less the initial payment and any amount it paid to acquire the Coco Rico assets from CCRDG above and beyond "the release of CCRDG's payment obligations under the" 2008 APA. *Id.*

The Assignment Agreement also required Elias, if it ultimately bought the Coco Rico assets, to negotiate (but not necessarily enter into) a consulting or employment agreement with Fuertes, under which Fuertes would provide services "related to the Coco Rico Assets." *Id.* § 1.03(c)(ii).

#### *d. 2013 Option Agreement Between Elias and CCRDG*

Soon after CCR and Elias executed the Assignment Agreement, on June 4, 2013, Elias and CCRDG entered into an option agreement that granted Elias certain rights to purchase the Coco Rico assets from CCRDG. *See* JSF ¶ 33; Dkt. 242-16 ("Option Agreement"). Pursuant to that agreement, Elias paid $250,000 in exchange for the "right and option" to purchase the "Coco Rico Assets" and certain real estate then owned by CCRDG. Option Agreement § 1.

To exercise that option, "[t]he consideration for the Coco Rico Assets [would] consist of": (1) a cash payment of $5.75 million, to be distributed to various creditors of CCRDG; and (2) "the irrevocable and complete release and extinguishment of the purchase price obligations of [CCRDG] under the [2008 APA] . . . , which APA was subsequently assigned by [CCR] to [Elias]," which the parties stipulated to be $8.5 million. *Id.* § 1(a)(i)(A), (B). The Option Agreement stated that "[t]his Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter." *Id.* § 7(f).[4]

*e. 2013 Ratification Agreement Between Elias, Fuertes, Roberto Fuertes, CCR, and "New CCR"*

On August 23, 2013, for reasons that are not relevant here, Elias entered into another agreement with CCR, along with Fuertes, Roberto Fuertes, and another entity also called "CCR International, Inc.," which the agreement designated "New CCR." *See* JSF ¶ 33; Ratification & Acknowledgment Agreement at 1. That agreement, *inter alia*, clarified that the total amount owing under the 2008 APA was $8.5 million. *See* Ratification & Acknowledgment Agreement § 1.01(j). The parties also "ratifie[d] and confirm[ed] the Assignment Agreement" and "every one of its provisions," and New CCR and the Fuertes brothers each agreed to jointly and severally undertake all of CCR's obligations and covenants under the Assignment Agreement. *Id.* § 2.02. Further, they each agreed never to "directly or indirectly challenge, question or attack" that Agreement. *Id.* § 2.03(a).

[4] As discussed more fully below, each of the relevant agreements here contained a very similar merger or integration clause. *See* Assignment Agreement § 7.07; Dkt. 242-17 ("Ratification & Acknowledgment Agreement") § 6.08; Dkt. 242-18 ("2015 APA") § 9.06; Dkt. 242-21 ("2015 ICA") § 17.

*f. 2015 Asset Purchase Agreement Between Elias and CCRDG*

On April 15, 2015, CCRDG sold all the Coco Rico assets to Elias. *See* JSF ¶ 39; 2015 APA.[5] The agreement effecting that sale defined the purchase price that Elias would pay to include the following. First, Elias "shall, concurrently with Closing, release and extinguish all of the purchase price obligations of Seller to Buyer pursuant to the [2008 APA] . . . , which was subsequently assigned by [CCR] to [Elias]." 2015 APA § 2.04(a). Second, Elias had to pay a "cash purchase price of $4,750,000," to be distributed to several of CCRDG's creditors, including BanCoop. *Id.* § 2.04(b). Last, Elias agreed to issue CCRDG a promissory note in the amount of $1 million, payable two years after the closing date, which CCRDG in turn agreed to assign to BanCoop. *Id.* § 2.04(c). CCRDG has confirmed that, aside from the BanCoop note, Elias paid the full cash purchase price and released CCRDG's $8.5 million payment obligations to Elias. *See* Rivera Tr. at 36–37, 67–68.

The 2015 APA also identified several "deliverables" that Elias and CCRDG agreed to exchange at closing, two of which the parties identify as relevant. *See* 2015 APA § 3.02. First, CCRDG agreed to deliver to Elias "all originals and all copies of the Formulas in any and all forms (written or electronic) and in the possession of whomever they may currently be (including Carlos Fuertes)." *Id.* § 3.02(a)(vii); *see* JSF ¶ 44. Second, CCRDG agreed to deliver to Elias "full, final and unconditional releases duly executed by Mr. Jose M. Fuertes . . . in full and final payment of any and all claims of Jose Fuertes against [CCRDG], including on account of a claim for profit sharing rights purportedly granted by [CCRDG] to Jose Fuertes" in the 2008 APA. 2015 APA § 3.02(a)(x); *see* JSF ¶ 44.

[5] Those assets were defined in the 2015 APA to include all inventory, contracts, "Intellectual Property Assets," tangible personal property, books and records, and all goodwill and the going-concern value of the Coco Rico business. 2015 APA § 2.01.

*g. 2015 Independent Contractor Agreement Between Elias and Fuertes*

Last, on April 21, 2015, Elias and Fuertes entered into an independent contractor agreement. *See* JSF ¶¶ 49–50; 2015 ICA. In it, the parties agreed that Fuertes "shall devote no less than 120 business hours per calendar month to the Services" unless the parties agreed otherwise in writing. *Id.* § 2. Fuertes also "agree[d] to maintain, at his sole cost and expense, a residence in New York State and suitable accommodations in Puerto Rico," and "agree[d] that this Agreement shall automatically terminate for Cause (as defined below) if [Fuertes] becomes a resident (whether fulltime or part time) in Puerto Rico or any other place outside of the State of New York." *Id.* § 6(b). The first paragraph in the 2015 ICA identified Fuertes's address as "14 America Way, Saratoga Springs, NY 12866." *Id.* at 1. Fuertes further "covenant[ed] and guarantee[d] that" he had caused all persons, including his family and CCRDG's owners, to deliver the copies of the Coco Rico concentrate formula to Elias, and that such persons would not retain copies of that formula. *Id.* § 8(a).

Fuertes's payment under the agreement was set by a schedule thereto, titled "Consulting Fee." *Id.* § 3; JSF ¶ 57. Under that schedule, Elias was to pay Fuertes $300,000 the day after the 2015 ICA was signed and another $250,000 after 30 days. *See* 2015 ICA, Schedule B § 1. Fuertes has testified that Elias paid him this initial $550,000 in 2015. *See* Fuertes Tr. at 94–95. Then, Fuertes was to receive no payments for the next two years. 2015 ICA, Schedule B § 2. In the third through seventh years of the agreement, Fuertes's annual compensation would depend on the amount of Coco Rico concentrate that Elias sold. *Id.* § 3. If that amount were less than 60,000 gallons in a given year, Fuertes would receive nothing that year; if it were between 60,000 and 75,000, he would receive $100,000; if it were between 75,000 and 85,000, he would receive $140,000; and if it were more than 85,000, he would receive $180,000. *Id.*

The 2015 ICA authorized Elias to terminate the agreement "at any time for 'Cause' if any" of several events occurred. As relevant here, those events included: (1) "[a]ny representation or warranty of [Fuertes] is untrue or incorrect in any respect"; (2) Fuertes "fails to fully comply with any obligation, agreement, covenant or guarantee contained in this Agreement"; (3) Fuertes "becomes a resident (whether fulltime or part time) in Puerto Rico or any other place outside of the State of New York"; and (4) Fuertes "commences or participates in any legal suit, action or proceeding against the company (except with respect to any breach by the Company of the Company's obligations under this Agreement)." *Id.* § 9(b)(i), (ii), (vii), (viii). If the agreement terminated, Fuertes "shall no longer have any rights" and "shall no longer be entitled to any fees or other payments" under it. *Id.* § 9(d).

**4. Post-Agreement Events**

On June 9, 2015, Elias wrote a letter to CCR, Fuertes, and Roberto Fuertes regarding the "Assignment Agreement and Ratification Agreement." *See* Dkt. 242-19 ("Buyout Letter") at 1. In that letter, Elias notified them that Elias had "consummated a transaction with CCRDG constituting a 'Coco Acquisition'" under the Assignment Agreement. *Id.* at 2. It recited that upon such acquisition, Elias's obligations to CCR pursuant to that Agreement became one of the following: yearly payments of $450,000 *or* a one-time payment of the "Buyout Amount," as set forth in the Agreement. *Id.* And, Elias wrote, it elected to pay CCR the Buyout Amount. After stating the definition of that term from the Assignment Agreement, Elias concluded that "[t]he calculation of the Buyout Amount results in a required payment of $0.00; to wit: $5,000,000, less, the Initial Payment of $150,000, reduced by: $6,041,000 of consideration given by Assignee for its acquisition of the Coco Rico Assets in addition to the release of CCRDG's payment obligations under the Asset Purchase Agreement." *Id.* Accordingly, Elias stated that it "has no further obligations under the Assignment Agreements." *Id.* at 3.

Thus, all told, as of Elias's Buyout Letter, the following transactions had occurred: CCR had sold the Coco Rico assets to CCRDG in 2008 for $12.8 million. CCRDG paid CCR only about $4 million of that purchase price, and owed about $9 million more. In 2013, CCR assigned its right to receive that $9 million in exchange for the payments set forth in the Assignment Agreement, including the $300,000 initial payment (of which Elias paid $150,000) and the "buyout amount" should Elias ever acquire the Coco Rico assets. Also in 2013, Elias paid $250,000 to CCRDG for the option to buy those assets from CCRDG. Then, in 2015, Elias bought those assets, paying CCRDG $4.75 million in cash, $1 million through a note, and also releasing CCRDG's $8.5 million obligation to Elias. CCR had thus received between $4 and $4.5 million for the company, most of which came from CCRDG and some of which Elias paid; CCRDG had received $5.75 million (all of which went to pay its creditors) plus the release of its debt, all from Elias; and Elias had paid a little more than $6 million, in cash and promises of payment, and also released CCRDG from paying Elias the $8.5 million to which Elias was entitled under the Assignment Agreement. And Elias now owned the Coco Rico assets.

Soon after receiving the Buyout Letter, Fuertes flew to the Dominican Republic, where he met with Hahn to discuss it. Fuertes Tr. at 90. When they met, Fuertes demanded $5 million "to comply with the agreement." *Id.* at 292. But the two did not resolve their dispute. *Id.* at 106; *see* First Hahn Tr. at 175 ("[Fuertes] came with me to the Dominican Republic and spent most of the time discussing this and saying he was going to sue and telling people who I was there with he was going to be suing, he was going to shut us down."). And for the most part, after that meeting Fuertes did not provide further services to Elias under the 2015 ICA. *See* Fuertes Tr. at 30–31; 106–07; *see also id.* at 90–93 (Fuertes only worked for, at most, the first three months after executing the 2015 ICA).

In August 2016, Fuertes moved from New York to Boca Raton, Florida.  *See* JSF ¶ 5;
Fuertes Tr. at 110 ("Q. After you signed [the 2015 ICA] at some point you stopped dwelling in
New York and began dwelling in Florida?  A. Yes.").

To date, Elias has not paid Fuertes anything beyond the initial $550,000 in 2015.

### B.    Procedural History

The history of these cases is baroque.  For the most part, that history is not relevant to the
pending motions.  The following summary solely concerns events bearing on those motions.

On August 25, 2015, CCR filed the original complaint against Elias and Coco Rico, LLC,
alleging, *inter alia*, breach of contract, trademark infringement, unfair competition, fraudulent
inducement, and unjust enrichment.  Dkt. 4.  The case was assigned to the Hon. Robert W.
Sweet.  On January 15, 2016, the Court granted Elias's partial motion to dismiss, dismissing the
bulk of CCR's claims but leaving intact its breach-of-contract claim.  Dkt. 29.  On April 4, 2016,
CCR filed an amended complaint, this time bringing claims only for breach of contract, unjust
enrichment, and quantum meruit.  Dkt. 47.

On July 6, 2016, Elias filed a complaint against CCRDG and Fuertes in New York State
Supreme Court, alleging that each had breached their contracts with, and had conspired to harm
and defraud, Elias.  No. 16 Civ. 6280, Dkt. 1-1.  On August 8, 2016, CCRDG and Fuertes
removed the case to this Court.  *See id.*, Dkt. 1.  On September 6, 2016, CCRDG and Fuertes
answered that complaint and filed counterclaims.  *Id.*, Dkts. 7, 10.  On January 12, 2017, Judge
Sweet consolidated the removed action with CCR's original federal action, Dkt. 81, and the two
cases jointly proceeded to discovery, Dkt. 87.

On September 1, 2017, BanCoop filed a complaint against Elias in this Court, alleging
breach of contract and conversion arising from Elias's failure to pay the note associated with the
2015 APA.  No. 17 Civ. 6697, Dkt. 1.  On December 5, 2017, Elias answered that complaint and

filed a third-party complaint against the CCR Parties, seeking common law contribution and indemnification. *Id.*, Dkt. 18. On March 14, 2018, the CCR Parties answered the third-party complaint in the BanCoop action and brought counterclaims against Elias, reprising their claims of trademark infringement, unfair competition, and breach of contract. *Id.*, Dkt. 38. "In the alternative" to their claim for damages for breach of contract, they also asked "the Court to rescind all contracts" between Elias and the CCR Parties. *Id.* at 11. On April 12, 2018, Judge Sweet accepted BanCoop's lawsuit as related to the first two. Dkt. 103. On June 26, 2018, he ordered all three cases consolidated. Dkt. 106.

On November 9, 2018, the Court dismissed the CCR Parties' claims for trademark infringement and unfair competition. Dkt. 113. Also on November 9, 2018, "[g]iven the plethora of pleadings and filings," the Court directed the CCR Parties and BanCoop to file a consolidated second amended complaint. Dkt. 114 at 1–2. Although they initially failed to file any amended pleading, Dkt. 119, on February 14, 2019, they sought leave to do so and filed a proposed consolidated amended complaint, Dkt. 120-1. Substantial confusion then ensued. *See* Dkt. 182 (explaining in greater detail the sparring over the propriety of the CCR Parties' proposed consolidated complaint).

On April 8, 2019, following Judge Sweet's passing, the consolidated cases were reassigned to this Court. On July 15, 2019, the Court sought to resolve the then-pending disputes over the operative pleadings. *Id.* It held that the February 14, 2019 amended complaint was not operative and directed the plaintiffs to file a motion for leave to file such amended complaint if they still intended to do so. *Id.* at 2. On August 16, 2019, following further apparent confusion among the parties, the Court directed the CCR Parties and BanCoop to file, within 20 days, "a single consolidated complaint setting forth their existing claims against the Elias Group that have

not already been dismissed by the Court." Dkt. 187 at 3. The Court stated that it did "not grant leave for the addition of new parties, new claims, or new factual allegations." *Id.*

On September 5, 2019, the plaintiffs filed a consolidated amended complaint. Dkt. 188. On September 16, 2019, the Court approved and entered a Civil Case Management Plan and Scheduling Order setting the close of fact discovery on December 16, 2019, and scheduling a case management conference for January 29, 2020. Dkt. 193.

On September 17, 2019, Elias filed a letter stating that the consolidated amended complaint "contains facts not previously alleged and a new remedy, rescission," in violation of the Court's directive. Dkt. 194. On September 18, 2019, the Court ordered the CCR Parties and BanCoop to each submit a sworn declaration explaining the new allegations in the complaint, and directed them to file another consolidated complaint that complied with the Court's order. Dkt. 195. The same day, plaintiffs' counsel filed a letter explaining the new allegations and seeking leave to file the amended complaint with minor revisions, but maintaining the claim for rescission. Dkt. 196. Elias opposed the inclusion of the latter. Dkt. 197. The Court granted plaintiffs leave to refile a slightly amended complaint, and instructed Elias that it was at liberty to move to dismiss any portion of it. Dkt. 198.

On September 23, 2019, BanCoop and the CCR Parties filed the consolidated amended complaint, which is now the operative pleading in this case. *See* CAC. It brought the following claims, solely against Elias: (1) BanCoop sought a declaratory judgment establishing its right to payment in full by Elias under the note associated with the 2015 APA, *id.* ¶¶ 90–92; (2) BanCoop

alleged that Elias had breached the terms of that note by failing to pay it, *id.* ¶¶ 93–102;[6] (3) the CCR Parties alleged that Elias had breached the 2013 Assignment Agreement, the 2013 Option Agreement, and 2015 APA by failing to pay $8.5 million to CCRDG "for the benefit of" CCR, *id.* ¶¶ 104, 106–111, and sought either damages for that breach or rescission of those agreements, *id.* ¶ 115; (4) the CCR Parties alleged that Elias breached the 2015 ICA by failing to pay Fuertes $180,000 annually, *id.* ¶ 105; and (5) the CCR Parties alleged that Elias breached the implied covenant of good faith and fair dealing, *id.* ¶¶ 112–115.

On October 15, 2019, Elias moved to dismiss the complaint in part. Dkt. 202. It argued that the claim for rescission was futile and tardy, and that the CAC's request for attorneys' fees was also futile. Dkt. 203. Plaintiffs opposed the motion to dismiss insofar as it related to the remedy of rescission, Dkt. 204, but conceded that attorneys' fees were not available under New York law, *id.* at 11. On November 7, 2019, the Court granted Elias's motion in part. Dkt. 205. It granted the motion to dismiss plaintiffs' claim for attorneys' fees but denied, without prejudice, the motion with respect to plaintiffs' rescission claim. *Id.* at 2–3. As to the latter, the Court held that, with the discovery deadline approaching, judicial economy counseled resolving the disputed issues along with the other claims at summary judgment. *Id.*

On November 18, 2019, Elias answered the CAC and brought counterclaims. Dkt. 215 ("Consol. Answer"). It claimed breach of contract and fraud against CCRDG, conspiracy against all three CCR Parties, breach of contract against Fuertes, and contribution and indemnification

[6] The CAC styled BanCoop's contract claim as two separate claims—one for "Breach of Contract" and the other for "Contractual Damages." CAC ¶¶ 93–102. That distinction is irrelevant for purposes of the pending motions.

against all the CCR Parties. *Id.* ¶¶ 67–90.[7] On December 9, 2019, the CCR Parties answered Elias's counterclaims. Dkt. 222.

On January 31, 2020, the parties notified the Court that they had agreed to settle BanCoop's claims against Elias. Dkt. 232. The same day, Court discontinued the BanCoop action, which remains closed. *See* No. 17 Civ. 6697, Dkt. 120. As a result, BanCoop's claims against Elias, *see* CAC ¶¶ 90–102, are no longer in the case.

With discovery closed, on February 5, 2020, the Court held a pre-motion conference with the remaining parties. On March 27, 2020, Elias filed a motion for summary judgment, Dkt. 242; a memorandum of law in support, Dkt. 242-2 ("Elias Mem."); the parties' joint statement of undisputed facts, JSF; and accompanying exhibits. On April 24, 2020, the CCR Parties filed a motion for summary judgment, Dkt. 247; a memorandum of law in support, Dkt. 248 ("CCR Mem."); and accompanying exhibits. On May 8, 2020, Elias filed a response in further support of its own motion for summary judgment and in opposition to the CCR Parties' motion. Dkt. 249 ("Elias Resp."). On May 18, 2020, the CCR Parties replied. Dkt. 250 ("CCR Reply").

## II. Legal Standard

### A. Legal Standard Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

[7] None of Elias's counterclaims are at issue in the pending motions.

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

**B. Relevant Principles of New York Contract Law**

For the most part, the agreements relevant here are governed by New York law. *See* Assignment Agreement § 7.12; Option Agreement § 7(k); Ratification Agreement § 6.13; 2015 APA § 9.10(a); 2015 ICA § 19.[8] Under that law, the interpretation of an unambiguous contract is a question of law to be addressed by the Court. *See, e.g.*, *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 451 (1983). So, too, is the determination whether a contract

[8] The sole exceptions are the 2008 APA and the 2009 ICA, which each contain a choice-of-law provision identifying the law of Puerto Rico as controlling. The parties do not dispute the interpretation of those agreements, and agree that New York contract law controls the outcome of this dispute. Thus, the Court, like the parties, relies exclusively on that law. *See Am. Fuel Corp. v. Utah Energy Co.*, 122 F.3d 130, 134 (2d Cir. 1997).

provision is ambiguous.  *See, e.g.*, *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004); *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).  A contract is ambiguous only where "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Goldman Sachs Grp., Inc. v. Almah LLC*, 85 A.D.3d 424, 426 (1st Dep't 2011) (citation omitted); *see also Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005).  A contract is not ambiguous merely because the parties ask the Court to construe it differently.  *See Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010).

In determining the meaning of a contract, the Court "look[s] to all corners of the document rather than view[ing] sentences or clauses in isolation."  *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989) (citation and internal quotation marks omitted); *see also Kass v. Kass*, 91 N.Y.2d 554, 566–67 (1998).  "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162.  In other words, the Court's "primary objective is to give effect to the intent of the parties as revealed by the language they chose to use."  *Bolt Elec., Inc. v. City of New York*, 223 F.3d 146, 150 (2d Cir. 2000).  Where the question of liability turns solely on applying the unambiguous language of a contract to undisputed facts, summary judgment is appropriate.  *See Photopaint Techs. LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003).

## III.   Discussion

The pending motions concern the CCR Parties' claims against Elias under the Assignment Agreement, Option Agreement, 2015 APA, and 2015 ICA.[9]

---

[9] No party has moved for summary judgment on Elias's counterclaims.

The CCR Parties argue that, under those agreements, Elias unambiguously had to—but did not—pay CCR the $8.5 million that CCRDG originally owed to CCR. Accordingly, they seek an order directing Elias to pay that amount (or, in the alternative, rescinding some combination of those contracts).[10]

Elias also seeks summary judgment on the CCR Parties' breach-of-contract claim. It argues that the Assignment Agreement, Option Agreement, and 2015 APA make clear that it has fulfilled all of its obligations to CCR and CCRDG. It also argues that Fuertes's claim for $180,000 per year under the ICA are unsupported by any evidence in the summary judgment record, and are, in fact, defeated by other evidence that has been adduced.

The Court first addresses Elias's obligations to CCR, and then turns to its obligations to Fuertes. Because Elias has fulfilled all relevant contractual duties to each party, the Court holds with Elias on both sets of claims.

### A. Elias's Obligations to CCR

#### 1. Breach of Contract

Under New York law, an action for breach of contract requires "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). Here, the parties dispute only whether Elias has breached any agreement. Although the CCR Parties appear to contend that the Assignment Agreement, the Option Agreement, and the 2015 APA each obliged Elias to pay CCR $8.5 million upon its acquisition of the Coco Rico assets, each

[10] Although CCRDG remains a party, it is unclear what relief it seeks, if any. Rivera has testified that it received all to which it was entitled under the 2015 APA, and that its only remaining dispute related to the BanCoop claims, which have since been resolved. *See, e.g.*, Rivera Tr. at 67–68 ("Elias paid me all the payments that were established basically for closing . . . [o]ther than the assignment note to the bank."); *id.* at 36–37, 70–71.

agreement has distinct terms. The Court addresses each in turn, and finds that none imposes obligations to CCR that Elias has not fulfilled.

The Assignment Agreement says nothing about Elias's obligation to pay off CCRDG's debt to CCR. In fact, it establishes the opposite. Under that Agreement, Elias stepped into CCR's shoes as the party entitled *to receive* CCRDG's payments under the 2008 APA. *See* Assignment Agreement § 1.01(a) ("Assignor [*i.e.*, CCR] hereby sells, assigns, transfers conveys and delivers to Assignee [*i.e.*, Elias] . . . (a) All rights of Assignor to *receive payments* under the [2008 APA] . . . ." (emphasis added)). Generally, an assignment like that "extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984); *see also, e.g.*, *Diesel Props S.r.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) ("It has always been the law in New York that an assignee stands in the shoes of its assignor . . . ." (citation omitted)). And it would have been curious for Elias to pay CCR hundreds of thousands of dollars, and potentially much more, merely for the privilege of becoming CCR's debtor. CCR's argument that Elias "stepped into the shoes of [CCRDG]" through the Assignment Agreement thus has things backwards. CCR Mem. at 8. Elias did not "assume[] [CCRDG's] debt" in 2013. *Id.* Instead, it assumed CCR's right to receive CCRDG's payments on that debt.[11]

In exchange for that right, Elias did commit to certain payments. But none included a promise to pay the then-$9 million debt that Elias had, in the same agreement, bought the right to collect on. First, it agreed to pay the $300,000 initial payment, of which only $150,000 appears to have come due. *See* Assignment Agreement § 1.03(a). Second, it agreed to pay CCR certain

[11] Fuertes's testimony confirms this. *See* Fuertes Tr. at 40 (confirming that "CCR thought . . . that Elias would take that note and *become a creditor* of CCRDG" (emphasis added)).

amounts paid by CCRDG to Elias under the assigned debt. *See id.* § 1.03(b) (noting that those payments were "conditional upon [Elias] having received such sums from CCRDG"). Third, if Elias were to buy the Coco Rico assets from CCRDG, Elias had two options as to CCR: it could either (1) make annual payments of $450,000 to CCR until it paid the Buyout Amount, or (2) pay the Buyout Amount. *Id.* § 1.03(c)(ii).[12] The Buyout Amount, which Elias elected in 2015, was capped at $5 million. *See id.* § 1.03(c)(iii) ("The term 'Buyout Amount' means $5,000,000 reduced by the following amounts . . . ."). And, among other offsets, it contemplated reducing that maximal $5 million amount by any later payments by Elias to acquire the Coco Rico assets "in addition to *the release* of CCRDG's payment obligations under the [2008 APA]." *Id.* § 1.03(c)(iii)(2) (emphasis added).

Thus, far from requiring Elias to "pay the debt and an additional $5 million in the event it purchased the Coco Rico Assets," CCR Mem. at 20, the Assignment Agreement contemplated Elias's *releasing* CCRDG's debt—which after the Assignment Agreement, was owed to Elias—as consideration for the Coco Rico assets. And if Elias paid CCRDG anything beyond that release, Elias could apply those payments against the $5 million Buyout Amount owed to CCR

[12] The CCR Parties argue that the Assignment Agreement could be read to require Elias to pay *both* those $450,000 annual payments *and* the Buyout Amount, given a separate term in the contract stating that "the word 'or' is not exclusive." *See* CCR Mem. at 22 (quoting Assignment Agreement § 7.01(b) ("Interpretation")). But the plain terms of the Agreement do not leave room for such maneuvering. Whatever the proper interpretation of the word "or" might be standing alone, the surrounding context here makes clear that Elias could choose one or the other payment option. *See* Assignment Agreement § 1.03(c)(ii) (allowing Elias to make "either (in Assignee's [*i.e.*, Elias's] discretion) of the following payments to" CCR). Requiring Elias to pay both amounts would conflict with both the "discretion" granted therein and the term "either."

under the Assignment Agreement.[13]  That is exactly what Elias did.  *See* Buyout Letter (noting that Elias had both released CCRDG's debt to it *and* paid CCRDG more than $5 million).[14] Accordingly, nothing in the Assignment Agreement—which expressly capped Elias's buyout payment to CCR at $5 million and granted Elias the right to receive, not pay, the debts of CCRDG—required Elias also to pay CCR the amount of CCRDG's $8.5 million debt.  Its failure to do so, therefore, was not a breach of that agreement.

Nor did the Option Agreement or the 2015 APA—both of which were solely between CCRDG and Elias, not CCR—require Elias to pay off CCRDG's debt, which was by then owned by Elias.  Each of those agreements included, as part of the purchase price Elias was to pay, the "release and extinguishment" of CCRDG's debt.  *See* Option Agreement § 1(a)(i)(B); 2015 APA § 2.04(a).  And the Option Agreement, but not the 2015 APA, stipulated that the amount of that debt was $8.5 million.  *See* Option Agreement § 1(a)(i)(B).  The CCR Parties thus argue that, regardless of the contents of the Assignment Agreement, these later agreements' provisions for "release and extinguishment" of CCRDG's obligations unambiguously required Elias to pay

---

[13] Again, that matches Fuertes's testimony about the purpose of the assignment to Elias.  *See* Fuertes Tr. at 40 (agreeing that Elias would "use its creditor status to nego[t]iate a sale of the Coco Rico assets which were now owned by CCRDG").

[14] The CCR Parties briefly contend that, under this interpretation of the Assignment Agreement, that contract may be void for lack of consideration because it means Elias "engineered a situation in which it could choose between $450,000 a year or zero as payment for the $8.5 million note." CCR Mem. at 26–27.  That is incorrect.  Elias paid $150,000 to CCR in exchange for the debt, as well as additional conditional payments if CCRDG paid off some portions of the debt and a potential $5 million more, depending on the terms of Elias's ultimate acquisition of the Coco Rico assets.  Under New York law, "[a]bsent fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny."  *Apfel v. Prudential-Bache Sec. Inc.*, 81 N.Y.2d 470, 476 (1993).  The CCR Parties do not argue that either fraud or unconscionability is present here.  Thus, because Elias unquestionably provided "something of 'real value in the eyes of the law'" in exchange for CCR's right to receive CCRDG's payments under the 2008 APA, *see id.* (quoting *Mencher v. Weiss*, 306 N.Y. 1, 8 (1953)), the Assignment Agreement does not fail for want of consideration.

CCRDG's remaining obligations to CCR. In support, they contend that the only way a party can "extinguish" a debt is by paying it, and that Elias failed to do so. *See, e.g.*, CCR Mem. at 21; CCR Reply at 2–3. Elias responds that neither agreement required Elias to pay CCR anything. Instead, each required Elias to release CCRDG's debt to Elias.

Elias is again correct. The CCR Parties' argument rests on an erroneous premise: that either CCRDG or Elias still owed a debt *to CCR* after CCR assigned its rights under the 2008 APA to Elias. But as of June 2013 (when Elias and CCRDG entered into the Option Agreement) and April 2015 (when they entered the 2015 APA), CCRDG had no remaining obligations to CCR.[15] Its sole obligation was to Elias, which had taken over CCR's rights to CCRDG's debt through the January 2013 Assignment Agreement. *See* Assignment Agreement § 1.01(a) (CCR "hereby sells, assigns, transfers conveys and delivers to [Elias] . . . (a) All rights of [CCR] to receive payments under the [2008] Asset Purchase Agreement."); *see also Aaron Ferer & Sons*, 731 F.2d at 125 (assignment of debt "extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor"); *Diesel Props*, 631 F.3d at 55 ("It has always been the law in New York that an assignee stands in the shoes of its assignor . . . .").

Indeed, these later agreements recognized that fact. The 2015 APA is clearest. It states, "Buyer shall, concurrently with Closing, release and extinguish all of the purchase price obligations *of Seller to Buyer*" under the 2008 APA, "which was *subsequently assigned* by [CCR] to Buyer." 2015 APA § 2.04(a). "Seller," in the 2015 APA, means "CCR Development Group, Inc." and "Buyer" means "Elias Group LLC." *Id.* at 1. The 2015 APA does not mention any obligation of either party to CCR. Similarly, the Option Agreement recognized that

[15] And, as discussed above, Elias's obligations to CCR did not include payment of CCRDG's then-outstanding debt.

CCRDG's "purchase price obligations" under the 2008 APA—which Elias agreed to release and extinguish—had been "subsequently assigned by [CCR] to [Elias]." Option Agreement § 1(a)(i)(B). Elias's sole obligation under these provisions, therefore, was to extinguish CCRDG's debt *to Elias*—which it did. *Id.* § 2.04(a); *see* Rivera Tr. at 69–71.

Accordingly, when Elias bought the Coco Rico assets in April 2015, there was no debt to CCR for Elias to release or extinguish. And neither the Option Agreement nor the 2015 APA contemplated one—only a debt owed *to Elias*. Elias therefore did not breach any obligation—to either CCR or CCRDG—by failing to pay CCR $8.5 million after buying the Coco Rico assets for $5.75 million and releasing CCRDG's debt to it.

None of the CCR Parties' arguments to the contrary support a different result. Mostly, they rely on deposition testimony from Fuertes, Rivera, and another CCRDG employee attesting to their belief that, under the above agreements, Elias had agreed to pay CCR $8.5 million if it bought the Coco Rico assets from CCRDG. *See* CCR Mem. at 12, 13–16, 17. But such extrinsic evidence is generally irrelevant to determinations of the meaning of an unambiguous contract, and neither side argues that any of the agreements are ambiguous. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 208 n.10 (2d Cir. 2005). "Where the terms of an agreement are clear and unambiguous, courts do not look beyond the four corners of the agreement, and parol evidence of the parties' intentions is inadmissible." *GPIF-I Equity Co. v. HDG Mansur Inv. Servs., Inc.*, No. 13 Civ. 547 (CM), 2013 WL 3989041, at *5 (S.D.N.Y. Aug. 1, 2013) (citing *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 33 (2002)). And "[e]ven if the Court were to consider extrinsic evidence, the post-hoc and often self-serving testimony of the parties' witnesses 'as to their subjective interpretations of the contract . . . [is] of little value to the Court's present analysis of the Agreement.'" *Process Am., Inc. v. Cynergy Holdings, LLC*,

No. 12 Civ. 772 (BMC), 2014 WL 3844626, at *4 (E.D.N.Y. Apr. 30, 2014) (alterations in original) (quoting *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 306 n.10 (S.D.N.Y. 2010)), *aff'd*, 839 F.3d 125 (2d Cir. 2016).  Accordingly, such testimony does not help the CCR Parties here.

Similarly, the CCR Parties rely on certain other extrinsic evidence from around the time of the Option Agreement as evidence that Elias must have understood that agreement to oblige it to pay CCR whatever amount was then owing under the 2008 APA.  First, they cite a May 23, 2013 draft of the Option Agreement, which contained a footnote speaking to the total payment Elias might have to make should it exercise its option.  That footnote explained that the amount of Elias's cash payment (ultimately set at $5.75 million in the Option Agreement) "depend[ed] on whether the remaining payment obligations of [CCRDG] under the [2008] APA . . . are for $9,000,000 or $8,500,000."  Dkt. 248-6 ("Draft Option Agreement") § 1(a)(i) n.1.  If the debt was worth $9 million, then Elias's cash payment would be $5.25 million; if it was worth $8.5 million, then Elias's cash payment would be $5.75 million.  *Id.*  This was because the draft set forth an "assumed value of $14,400,000," the cash portion of which would be reduced by the total amount of the debt still owed and the then-assumed $150,000 payment for the option itself. *Id.*; *see id.* § 1.

Second, they cite an email from five days later, on May 28, 2013, in which Hahn, negotiating for Elias, wrote to Rivera, "[w]e need to conclude before we sign this what is the exact remaining amount owed to [CCR] under the APA ($8.5 or $9 million). . . .  As I am sure you understand I need to know in advance exactly *how much I am going to have to pay* if I exercise the option."  Dkt. 248-7 ("Hahn Email") (emphasis added) (attaching draft of option agreement still containing both sets of numbers discussed above—$5.25/$5.75 million and

$8.5/$9 million). The CCR Parties argue that each document shows that Elias contemporaneously understood that, if it bought the Coco Rico assets from CCRDG, it would have to pay CCR whatever debt CCRDG still owed. *See* CCR Mem. at 9–10, 22.

But this evidence, too, is impermissible extrinsic proof of the unambiguous Option Agreement's meaning. *See, e.g.*, *R/S Assoc.*, 98 N.Y.2d at 33. Although (unlike the deposition testimony discussed above) this evidence is at least contemporaneous with the negotiations of the contract, the Option Agreement expressly rejects reliance on such evidence in determining that agreement's meaning. *See* Option Agreement § 7(f) (Option Agreement "supersede[s] all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter."); *see, e.g.*, *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 433–34 (2013) ("[W]here a contract contains a merger clause, a court is obliged to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." (citation omitted)).

In any event, even if it were cognizable, this evidence would not support the CCR Parties. Elias's position is that it agreed to pay CCRDG the total consideration of $14.5 million for the Coco Rico assets—$250,000 for the option, $5.75 million in cash and a note, and $8.5 million through the release of CCRDG's debt to it. *See, e.g.*, Elias Mem. at 25. According to the Draft Option Agreement, the cash amount Elias would pay was inversely proportionate to the debt that would be released and extinguished, so that the total amount of the two would sum to $14.4 million. Thus, Hahn's statement that the determination of the amount of CCRDG's debt affected how much was "going to have to pay" does not establish that Elias expected to pay that debt. It simply reflects the fact that, per the draft agreement, the "cash purchase price" Elias would have to pay depended on the amount still owing under the original 2008 APA.

Last, the CCR Parties argue that Elias must have agreed to pay CCR the remaining debt owed by CCRDG to Elias because the term "extinguish" necessarily entails payment of a debt. *See* CCR Mem. at 21.  But the authorities they cite do not support that proposition.  *See, e.g.*, *In re Lehman Bros. Holdings*, 703 F. App'x 18, 21 (2d Cir. 2017).  And ample other case law makes clear that a debt can be extinguished through other means, including, as Elias did here, through a release by the obligor.  *See, e.g.*, *Marculescu v. Ovanez*, 27 A.D.3d 701, 701–02 (2d Dep't 2006) (describing "release given to [defendant] by the plaintiff, which extinguished [defendant's] debt to the plaintiff"); *see also McCrea v. Purmort*, 16 Wend. 460, 474 (N.Y. 1836) ("[A] receipt for the payment does not pay the debt, it is only evidence that it has been paid.  Not so of a written release; it is not only evidence of the extinguishment, but it is the extinguisher itself.").[16]  Thus, Elias's agreement to "release and extinguish" CCRDG's debt is best read to mean that Elias would extinguish CCRDG's debt *to Elias* by releasing it, as part of the consideration for Elias's purchase of the Coco Rico assets.  *See Lapidus v. Hiltzik*, 160 A.D.2d 682, 683 (2d Dep't 1990) ("[T]he defendants' release of [plaintiff's] debt constituted consideration given in exchange for the return of the stock to the corporation.").

Elias thus did not breach any contract by failing to pay CCR $8.5 million because it never agreed to do so.  Accordingly, the Court grants Elias's motion for summary judgment, and denies the CCR Parties' motion for summary judgment, as to the CCR Parties' breach-of-contract claim.[17]

---

[16] The parties spar over the definition of "extinguish" as used in successive versions of *Black's Law Dictionary*.  *See* CCR Mem. at 1; Elias Resp. at 1–3; CCR Reply at 2, 8–9.  In light of the above, the Court does not have occasion to engage with that debate.

[17] The CCR Parties alternatively seek damages arising from Elias's unjust enrichment "if there is no contract."  *See* CCR Mem. at 27.  The CAC does not include a claim for unjust enrichment.  *See* CAC ¶¶ 90–115.  In any event, the Court holds that the relevant contracts are all valid and

### 2. Rescission

For much the same reasons, the Court also grants Elias's motion as it relates to the CCR Parties' claim for rescission of the Assignment Agreement, Option Agreement, and 2015 APA. *See* CAC ¶ 115. "Under New York law, a plaintiff may obtain rescission—in lieu of actual damages—when a breach of contract is either 'material and willful' or 'so substantial and fundamental' that it 'strongly tend[s] to defeat' the purpose of the contract." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 227 (2d Cir. 2017) (quoting *Graham v. James*, 144 F.3d 229, 237 (2d Cir. 1998)). Rescission may also be available where a party shows "fraud in the inducement of the contract; failure of consideration; an inability to perform the contract after it is made." *We Shall Overcome Found. v. Richmond Org., Inc. (TRO Inc.)*, 221 F. Supp. 3d 396, 413 (S.D.N.Y. 2016) (quoting *Babylon Assocs. v. Suffolk County*, 101 A.D.2d 207 (2d Dep't 1984) (per curiam)). "Because it is an equitable remedy, rescission is available only if damages would not be a 'complete and adequate' remedy and 'the status quo may be substantially restored' by equitable relief." *Pyskaty*, 856 F.3d at 227 (quoting *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13 (1972)). In all events, "[r]escission is an extraordinary remedy," appropriate only in limited circumstances. *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 143 (2d Cir. 2000) (citation omitted).

---

enforceable. The Court, accordingly, denies the CCR Parties' motion insofar as it relates to unjust enrichment.

Further, although the CAC's claim for a breach of the implied covenant of good faith and fair dealing does not appear viable in light of the above, Elias has not discussed it and appears solely to have moved for summary judgment on the CCR Parties' breach-of-contract claims. *See* Elias Mem. at 1 (Elias "moves for summary judgment on plaintiffs' two separate breach of contract claims . . . ."). Accordingly, the Court has no occasion to rule on that claim here.

Even if the CCR Parties timely raised this claim—which Elias disputes, *see* Elias Mem. at 27–28[18]—the remedy of rescission is unavailable to them.  The Court has already held that they have failed to show any breach of contract by Elias, let alone a "material or willful" or "substantial and fundamental" one that "strongly tend[s] to defeat the purpose" of any contract. *See Pyskaty*, 856 F.3d at 227.  The Court has also held that the Assignment Agreement is not void for lack of consideration.  *See supra* note 14.[19]  And the CCR Parties have not alleged fraud in the inducement.  They briefly contend that rescission may be warranted due to failure of consideration, but that argument merely reprises their breach-of-contract theory.  *See* CCR Mem. at 28 ("[The CCR Parties] are attacking Elias'[s] failure to pay the consideration it agreed to pay. Elias'[s] failure to pay affords the CCR Plaintiffs the right to rescind the contract."); *see also id.* (asking or rescission only "[i]f the Court decides that Elias owes the $8.5 million").

Accordingly, there is no basis on which to rescind any agreement between the parties.

---

[18] Although unnecessary to the Court's holding on the CCR Parties' rescission claim, Elias appears also to be correct on this point.  "An action for rescission must be initiated without unreasonable delay." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 47 (2d Cir. 1991) (citing *Schenck v. State Line Tel. Co.*, 238 N.Y. 308, 313 (1924) (Cardozo, J.)).  "This requirement of promptness is not an affirmative defense; it is 'an element of a *prima facie* rescission action and the burden of proof is on plaintiff.'"  *In re Schick*, 232 B.R. 589, 596 (Bankr. S.D.N.Y. 1999) (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994), *aff'd*, 57 F.3d 146 (2d Cir. 1995)).  Despite suing in 2015 and amending their pleadings many times since then, the CCR Parties first mentioned rescission nearly three years later, in their 2018 counterclaims against Elias in the BanCoop action.  No. 17 Civ. 6697, Dkt. 38 at 11.  Although the CCR Parties assert that CCR "demanded rescission of the Asset Purchase Agreement from the day it filed suit," CCR Mem. at 27, they offer no support for that proposition or explanation for why they waited several years to introduce that claim.  Similarly, their claim that "[i]n August 2015," CCR sued Elias "asking the Court to either enforce or rescind the contract" is simply false—the Complaint did not mention rescission.  Dkt. 4.

[19] Nor is there any serious argument that either the Option Agreement, for which Elias paid $250,000, *see* Option Agreement § 1, or the 2015 APA, for which Elias paid $4.75 million in cash, $8.5 million through the release of CCRDG's debt obligations, and another $1 million in the form of a note, *see* 2015 APA § 2.04, are lacking in consideration.

**B. Elias's Obligations to Fuertes**

Last, the Court addresses Elias's motion for summary judgment on Fuertes's claim for payment under the 2015 ICA. Elias argues that Fuertes does not merit further payment, beyond the $550,000 he already received, for five reasons: (1) Fuertes moved from New York to Florida, triggering the automatic termination of the 2015 ICA; (2) Fuertes ceased working for Elias within the first three months of the agreement, thereby failing to perform the agreed-upon 120 hours per calendar month of services for Elias; (3) Fuertes failed to timely provide the Coco Rico formula as promised in the 2015 ICA; (4) Fuertes commenced the instant litigation against Elias on behalf of CCR; and (5) Fuertes has not presented evidence that Elias sold more than 60,000 of Coco Rico concentrate during any given year, which was required to trigger Elias's payment obligations to him. *See* Elias Mem. at 29–32.

Fuertes disputes each point. First, he argues that despite the contract term requiring that he maintain his residence in New York, the parties at the time of contracting knew that Fuertes was a resident of Puerto Rico, and that he should therefore be relieved of his obligation to maintain a New York residence. Second, he argues that he ceased working for Elias only because Elias breached the Assignment Agreement, causing "the destruction of Fuertes'[s] life's work," and giving rise to a "severe hostile environment" constituting a constructive discharge. CCR Mem. at 29. Third, he contends that he was not under any obligation to provide Elias with the Coco Rico formula until after he signed the 2015 ICA, at which point he did so. Fourth, he contends that his only participation in this lawsuit has been bringing claims under the 2015 ICA, which that agreement expressly permits. Last, he argues that Elias has adduced insufficient evidence that it produced fewer than 60,000 gallons of Coco Rico concentrate in 2017 or thereafter. On each point, he maintains, these issues must be resolved by the factfinder at trial.

The Court need not resolve all of these disputes because the resolutions of at least three of them dictate granting Elias's motion for summary judgment.

First, from 2017 onward, Fuertes's payment under the 2015 ICA hinged on Elias's sales of Coco Rico concentrate each year. If Elias sold fewer than 60,000 gallons in a given year, Fuertes would not receive any payment. *See* 2015 ICA, Schedule B § 3(a) ("If the Company has sold in the previous one-year period of the Term less than 60,000 gallons of Coco Rico concentrate to customers: $0."). Thus, to show that Elias breached its obligation to pay Fuertes anything, there must at least be a genuine dispute of fact as to whether Elias in fact met that sales benchmark. *See Celotex*, 477 U.S. at 325–26. And Elias notes that Fuertes has not adduced any evidence that Elias produced more than 60,000 gallons in 2017–2018 or thereafter. *See* Elias Mem. at 32.[20]  In further support, Elias cites Hahn's deposition testimony that he did not believe Elias had done so. *See* First Hahn Tr at 191 ("I don't know off the top of my head, but my suspicion is that it would not be 60,000 gallons."); Dkt. 242-27 ("Second Hahn Tr.") at 230–31, 302–03 (estimating that Elias produced about 50,000 gallons of concentrate during the relevant period). And in fact, schedules attached to the 2015 ICA show that CCRDG had not sold more than 60,000 gallons of concentrate in either 2013 or 2014—the last two years for which data are available. *See* 2015 ICA, Schedule B, Ex.1  (47,0040 gallons in 2011; 71,700 gallons in 2012; 59,815 gallons in 2013; and 59,519 gallons in 2014).

Fuertes's only response is that "Elias provides no evidence as to the claim that Elias is not producing 60,000 gallons a year." CCR Mem. at 29. But that reverses the parties' burdens.

---

[20] The 2015 ICA provided that, after receiving the initial $550,000 due under that agreement, Fuertes would not receive compensation for the two years after its execution. *See* 2015 ICA, Schedule B §§ 1, 2. Thus, the first year in which he was eligible for compensation was 2017–2018.

Once Elias pointed out "an absence of evidence to support [Fuertes's] case," it became Fuertes's burden to "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *Jaramillo*, 536 F.3d at 145; *see Hicks*, 593 F.3d at 166 (cannot raise issue of material fact through "mere speculation or conjecture as to the true nature of the facts"). After more than five years of litigating this case, Fuertes has not adduced any evidence that Elias sold enough concentrate to trigger its payment obligations to him. Accordingly, he cannot show that Elias breached any obligation to him by failing to pay him an annual fee. Even had Fuertes satisfied all of his obligations in the 2015 ICA, the absence of evidence of his entitlement to payment under that agreement is fatal to his claim that Elias breached by failing to pay him.

Second, Fuertes has conceded that, in or around July 2015, he ceased performing work for Elias. *See* Fuertes Tr. at 90 ("I didn't perform the services too long."); *id.* at 91 ("Q. Would you agree that for no month, no calendar month did you devote 120 hours or more as an independent contractor? A. Probably the first month, probably. I don't know. Q. So no more than the first month? A. First two months maybe."); *id.* at 92 ("Q. Was it more than three months? A. No, I don't think so."); First Hahn Tr. at 175 ("[Fuertes] ceased to work."). Under the 2015 ICA, Fuertes agreed to "devote no less than 120 business hours per calendar month" to Elias. 2015 ICA § 2 ("Services"). If he "fail[ed] to fully comply with any obligation, agreement, covenant, or guarantee" in that agreement, Elias had the right to terminate the agreement for "cause." *Id.* § 9(b)(ii). Thus, nearly two years before Fuertes's entitlement to annual consulting fees vested, *see supra* note 20, he had elected not to provide any of the services set forth in the 2015 ICA. The undisputed evidence in the summary judgment record thus shows that Fuertes cannot establish a required element of his breach-of-contract claim: performance. *See Harsco Corp.*, 91 F.3d at 348.

Fuertes does not deny any of this.  Instead, he maintains that he was still entitled to the maximum payment available under the 2015 ICA—$180,000 per year—because Elias's breach of the Assignment Agreement created a hostile work environment that constructively discharged him.  *See* CCR Mem. at 29.  In support, he cites a single case: a Title VII case involving gender-based discrimination, which held that the discrimination alleged *did not* support a hostile-work-environment or constructive-discharge claim.  *See Shultz v. Congregation Shearith Isr. of City of N.Y.*, 867 F.3d 298, 308–09 (2d Cir. 2017).  But he does not cite any authority that a contractor who fails to perform his core contractual obligations may still receive payment under his contract, indefinitely, because he believes his counter-party breached a *separate* agreement that implicated his business interests.  *Cf. Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) ("A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." (citation omitted)).  Especially given the Court's holding that Elias did not, in fact, breach any obligation to CCR, there is no factual basis on which a rational finder of fact could conclude that Elias "deliberately ma[de] [Fuertes's] working conditions so intolerable that [he was] forced into an involuntary resignation." *Id.*  Given Fuertes's undisputed failure to perform the agreed-upon services—which gave Elias the right to terminate the contract for cause—he cannot establish a required element of his claim: his own adequate performance.

To be sure, Fuertes may have found it unpleasant to continue to work with Elias.  And he may have concluded in good faith that Elias had wronged him and his family's company.  Thus, there may well have been good reason for Fuertes and Elias, given the bad blood between them, to end their business relationship.  But in light of Fuertes's manifest failure to perform under the 2015 ICA, a reasonable trier of fact could not find that Fuertes was entitled to payment under it.

Third and finally, the 2015 ICA unambiguously, at multiple points, required Fuertes to maintain a residence in New York. *See* 2015 ICA § 6 ("[Fuertes] agrees to maintain, at his sole cost and expense, a residence in New York State and suitable accommodations in Puerto Rico. . . . [Fuertes] agrees that this Agreement shall automatically terminate for Cause (as defined below) if [Fuertes] becomes a resident (whether full time or part time) in Puerto Rico or any other place outside of the State of New York."); *id.* § 9(b)(vii) (Elias may terminate the agreement for cause if Fuertes "becomes a resident (whether fulltime or part time) in Puerto Rico or any other place outside of the State of New York"); *see also id.* at 1 (identifying Fuertes's address as "14 America Way, Saratoga Springs, NY 12866"). The first of those provisions stated that the agreement would "automatically terminate for Cause" if Fuertes decamped from New York. *Id.* § 6.

On August 8, 2016,[21] however, Fuertes moved from New York to Florida (while maintaining a domicile in Puerto Rico). JSF ¶ 5. Fuertes downplays this relocation, arguing that, when he and Hahn executed the agreement, Hahn knew that Fuertes lived in Puerto Rico and maintained homes both there and in New York, but refused to change this contract term even after Fuertes asked him to do so. *See* CCR Mem. at 28; Fuertes Tr. at 99–100, 108, 111–12. Even if such extrinsic evidence were cognizable in construing the plain terms of this contract,[22] it

[21] There is some inconsistency in the record on this point. The parties have stipulated that Fuertes moved from New York on the above date. But the testimony they cite shows Fuertes testifying that he did so in "July, 2017." *See* Fuertes Tr. at 28. The point appears immaterial, and the parties do not dispute it. Accordingly, the Court accepts as true, for purposes of the pending motions, the more precise date to which the parties stipulated in the JSF.

[22] *But see* 2015 ICA § 13 ("This Agreement supersedes all prior agreements and understandings, whether written, oral or otherwise, between the parties with respect to the engagement of the Consultant by the Company."); *Healy v. Williams*, 30 A.D.3d 466, 467 (2d Dep't 2006) ("As a general rule, where a contract has a provision which explicitly prohibits oral modification, such clause is afforded great deference.").

does not eliminate the 2015 ICA's clear requirement that Fuertes maintain a residence in New York. Whatever Hahn's representations to, and understandings with, Fuertes before they entered into the 2015 ICA, *see* Dkt. 248-4 at 28, their agreement unambiguously stated that it would "automatically terminate for Cause" if Fuertes took up residence in "any other place outside of the State of New York." 2015 ICA § 6. And even if the parties understood that Fuertes's maintenance of a home in Puerto Rico would not breach that term, Fuertes does not explain why his giving up his New York residence in favor of a move to Florida would not trigger the "automatic termination" provision. This, too, bars Fuertes's claim for entitlement to compensation under the 2015 ICA.

Accordingly, the Court grants Elias's motion for summary judgment on Fuertes's breach-of-contract claim.

**CONCLUSION**

For the foregoing reasons, the Court grants Elias's motion for summary judgment in full, and denies the CCR Parties' motion for summary judgment in full. The Court dismisses the CCR Parties' breach-of-contract claim under the Assignment Agreement, Option Agreement, and 2015 APA, and Fuertes's breach of contract claim under the 2015 ICA.

An order as to the next steps in this case will issue shortly. It will direct the parties promptly to discuss the means by which the outstanding claims are to be resolved. These are the CCR Parties' claim for breach of the implied covenant of good faith and fair dealing, CAC ¶¶ 112–114, and all of Elias's counterclaims, Consol. Answer ¶¶ 67–90.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 242 and 247 in 15 Civ. 6563.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: December 22, 2020
       New York, New York